ROEBUCK<br>*v.*<br>CURRY.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## THE BANK OF CHARLESTON *v.* HAGAN.

Defendant appointed an attorney by an instrument, under' seal, in these words, which was' delivered to the Bank of C.: "I hereby constitute M my true and' lawful attorney, for me and in my name to draw, endorse, or accept any bills of exchange, promissory notes, drafts, checks, for any sum or sums of money whatever; also to receive from the Bank of C. all moneys that may from time to time be due me by said bank, whether for dividends or otherwise, and for the same to execute all requisite acquittances; also to receive all pre-sentments, demands, protests, and notices, in relation to any notes, bills or negotiable in-struments, which may at any time be in possession of said bank, whether discounted or lodged for collection, upon which I am or may be chargeable, in the same manner as I would do, if personally present: and I do agree that the powers above granted shall be exercised, and that this instrument shall continue in full force, until revoked by some other written instrument, and until notice of such revocation shall have been delivered in writing to the cashier of the said bank; and lastly, I do hereby, for my heirs, executors, and admi-nistrators, jointly and severally, covenant and agree with the said Bank of C. and their assigns, that notwithstanding the death of me, or of any of us, every act, matter and thing, which shall be done in virtue of any part of these premises before notice of such death shall have been received by the said bank, shall be valid and binding, and shall charge my heirs, executors and administrators, jointly and severally, to the same extent as though such death had not occurred; and from all and every damage or loss to arise from any such act, matter, or thing, I do hereby bind myself, my heirs, executors and administrators, jointly and severally, to indemnify and fully save harmless the said bank and their assigns." M having made several notes in his own name, endorsed them as the attorney in fact of the defendant, and in his own name as last endorser. The notes were discounted by plaintiffs, and the proceeds received by M, who absconded, leaving them unpaid. In an action against defendant as endorser: *Held,* that this instrument is a contract between defendant and the Bank of C., and not a naked procuration to M; that the' endorsement was binding on de-fendant; that if it had been intended to confine the power to defendant's own business, there would have been some words of limitation; and that there is nothing in the rule that an agent cannot act so as to bind his principal where there is an adverse interest in him, which could prevent M from binding the defendant by the endorsement.

APPEAL from the First District Court of New Orleans, *McHenry,* J. The facts of this case are stated in the opinion of the court *infrâ.*

*Schmidt,* for the plaintiffs. The power of attorney is general in its nature, and authorised *McDonald* to draw, endorse, or accept any bill or note, for any sum or sums. There is no prohibition to *McDonald* to endorse his own notes, and courts cannot supply the limitation. The doctrine that an agent cannot act as such in a transaction in which his interest or employment is adverse to that of his principal, applies exclusively to factors and brokers, and other agents entrusted with the purchase and sale of property. The case of *Florance* v. *Adams,* 2 Rob. 556, differs essentially from this; there the power only autho-rised the agent to make and endorse notes *for the use* of the principal. See Addison on Contracts, pp. 146, 147, 168. 6 Amer. Jurist, pp. 2, 4.

*Roselius,* for the appellant. *McDonald* had not the legal capacity to endorse his own notes, for his own benefit, with the name of *Hagan.* Pothier's Pan-dects, lib. 17, tit. 1, no. 10. Pothier, Mandat, no. 14. 18 Duranton, nos. 206, 208, pp. 200, 202. Story on Agency, no. 210 to 214, p. 246; nos. 9, 10, p. 11. Story's Equity Jurisprudence, vol. 1, p. 338 *et seq.* ; no. 315 *et seq.* 3 Chitty's Comm. Law, p. 216 *et seq.* Paley on Agency, pp. 10, 11, 33, 37.

BANK OF
CHARLESTON
v.
HAGAN.

Livermore on Agency, p. 416 to 433.  *Church* v. *Marine Ins. Co.* 1 Mason's R. 341.  *Parkhurst* v. *Alexander*, 1 Johnson's Ch. R. 394.  *Shepherd* v. *Perry*, 4 Mart. N. S. 267.  *Copeland* v. *Merchants' Ins. Co.* 6 Pickering, 198.  *Beal* v. *Keernan*, 6 La. 407.  *Michoud* v. *Girod*, 4 Howard's R. 552.  *Florance* v. *Adams*, 2 Rob. 556.  It is contended that the power of attorney contains a *mercantile guaranty.*  Even if it did, the bank could not recover under the evidence in this case, as no notice is shown to have been given to *Hagan* that the bank had acted on this pretended guaranty; and without such notice no action can be maintained against the guarantor.  *Edmondston* v. *Drake*, 5 Peters 624. *Douglass* v. *Reynolds*, 7 Ib. 113.  *Lee* v. *Dick*, 10 Ib. 482.  *Adams* v. *Jones*, 12 Ib. 207.  *Reynolds* v. *Douglass*, 12 Ib. 497.

*Micou*, on the same side.

The judgment of the court was pronounced by

EUSTIS, C. J.  This suit is brought to make the defendant liable as endorser, on four promissory notes, amounting to $6,150, which had been discounted by the Bank of Charleston.  They were made by *Alexander McDonald* to the order of the defendant, bore date in the month of July, 1846, and were payable thirty days after date, at the bank; they were renewals of notes of the same parties, all originating within the year 1846.  They were endorsed by *McDonald*, as the attorney of the defendant, and bore, as the last endorser, the signature of *McDonald*, who absconded, leaving the notes unpaid.  There was judgment for the bank, and the defendant has appealed; and the argument for the defence has been principally directed to the want of authority on the part of *McDonald* to bind the defendant by his endorsement on these notes, as his attorney in fact.

The copy of the power of attorney offered in evidence is in print, and we think we are authorised by that fact, taken with the testimony of *Alexander Hagan*, a witness examined on the part of the defendant, in considering it as in the form of powers of attorney generally used at the bank.  It is in these words:

"STATE OF SOUTH CAROLINA.

" Know all men by these presents, that I, *John Hagan*, do hereby ordain, constitute and appoint *Alexander McDonald, Esq.* of Charleston, my true and lawful attorney, for me and in my name to draw, endorse or accept any bills of exchange, promissory notes, drafts, checks, for any sum or sums of money whatsoever; also to receive from the Bank of Charleston, South Carolina, all moneys that may from time to time be due me by the said bank, whether for dividends or otherwise, and for the same to execute all requisite acquittances; also to receive all presentments, demands, protests, and notices in relation to any notes, bills or negotiable instruments, which may at any time be in possession of the said bank whether discounted or lodged for collection, upon which I am or may be chargeable, in the same manner as I would do, if personally present.  Also, an attorney or attorneys under him for all or any of the aforesaid purposes from time to time to constitute and appoint, and the same to displace or remove, and others again to appoint and remove as often as he shall see fit; and all these acts to do as fully and effectually as I the constituent could, if personally present; hereby agreeing to ratify and confirm all the said attorney or my attorneys shall lawfully do in virtue of these presents.  And I, the said constituent, do agree that the powers above granted, shall be exercised, and that this instrument shall continue in full force until revoked by some other written instrument, and until notice of such revocation shall have been delivered in writing to the cashier of the said bank; and lastly, I, the said constituent, do hereby for my heirs, executors and administrators, jointly and severally cove-

nant and agree, with the said Bank of Charleston, South Carolina, and their assigns, that notwithstanding the death of me, the said constituent, or any of us, every act, matter and thing which shall be done in virtue of any part of these presents, before notice of such death shall have been received by the said bank, shall be valid and binding, and shall charge my heirs, executors and administrators, jointly and severally, to the same extent as though such death had not occurred; and from all and every damage or loss to arise from any such act, matter or thing, I do hereby bind myself, my heirs, executors and administrators, jointly and severally, to indemnify, and fully save harmless the said bank and their assigns. In witness whereof, I have hereunto set my hand and seal, this twenty-second day of October, in the year of our Lord one thousand eight hundred and forty-one.                    JOHN HAGAN.

"Sealed and delivered in the presence of
        "W. E. HAYNE, JR."

The original of this power of attorney was filed in the bank, and under its authority *McDonald* repeatedly endorsed his own notes, with the defendant's name, during the years 1841, '2, '3, '4, '5 and '6. The residence of the defendant was in New Orleans, where he was engaged in the business of selling slaves. He spent two or three weeks in Charleston every summer, on his way to Virginia, and passed through there on his return, his stay then being generally short. The defendant had business transactions with *McDonald*, and their intercourse was apparently friendly and intimate.

It is contended for the defence that, by the power of attorney, *McDonald* was only authorised to make and endorse notes in the name of the defendant for the business with which *McDonald* was entrusted by him, and not to endorse his, *McDonald's*, own notes; and it is conceded that the notes sued on were made and discounted for the accommodation of *McDonald*. Concerning the business of the defendant, with which *McDonald* is said to be charged, the power of attorney is silent, except as relates to the drawing, endorsing, and accepting bills of exchange, promissory notes, drafts and checks, receiving money due by the bank for dividends or otherwise, and demands and notices in relation to bills and notes held by the bank. The instrument contains no authority to *McDonald* to administer, manage, or interfere with the defendant's affairs, either generally, or in any particular case or contingency. There is nothing in it from which any such authority can be implied. Even the authority to borrow money, or raise funds for his use, is not substantively given, but rests exclusively upon the clause just referred to, which must be considered as containing the purpose and object of the powers, since none other is declared or even intimated.

The object of the power being thus to enable *McDonald* to use the defendant's name and credit in this form, the question is whether *McDonald* could use them for his own benefit, as he has attempted to do in the case before us; and if any thing short of express words to that effect could authorise it, they must be embraced in the very comprehensive terms in which the power of attorney is couched—to draw, endorse, or accept *any* bills of exchange, promissory notes, drafts, checks, for *any* sum whatever. The clauses by which *McDonald* should receive all demands, notices, &c. respecting negotiable instruments which might hereafter be held by the bank, on which the defendant should be chargeable; that the bank should not be affected by any revocation of the power, until notice of such revocation should be notified in writing to the cashier;

that the death of the constituent should not operate as a revocation of the power before notice of the death should have been received by the bank; and that his succession should be charged with all acts done under the power subsequent to the death and previous to the notice to the bank, provisions which the laws prevailing in the State of South Carolina may have rendered necessary, and the clause of indemnity at the conclusion of the power, appear to us to contain direct and formal covenants for the benefit and protection of the bank in its business to be done by virtue of this power. The last clause is to save harmless the bank, and its assigns, from all and every damage or loss, to arise from any such act, matter or thing. The relation of those general terms to the antecedent clause, or to the whole power, may be questionable; but that it contains a substantive agreement between two contracting parties, is not to be denied.

From the purport of this instrument it is evidently a contract between the defendant and the Bank of Charleston, and not a naked procuration to McDonald. The original, which is a deed under seal, was delivered to the bank, to which delivery the defendant must be considered as a party. The object of it related to the obligations of the defendant resulting from the paper which McDonald should endorse or draw in his (Hagan's) name, and the terms used are general both as to its character and amount. and only limited as to its form. If it was to be confined in its use to the defendant's own business. there would have been some words of limitation; something from which such an inference would result. With the usual language in which these instruments are clothed we are not unfamiliar, and when we consider that it is a contract between two parties in the relative position of the plaintiffs and the defendant which we are to expound, we cannot consider that the endorsement of McDonald's own notes was excluded from the power given to him. The words for me and in my name to draw, &c., without any terms of restriction whatever, or any other power implying restriction, are, in our opinion, insufficient to create it. They rather refer to the manual act of writing by substitution, in place of personal presence.

We have considered with great care the several decisions to which we have been referred by the counsel for the defendant. They are all cases arising under powers of attorney, and we have seen none in which the power was a substantive part of a direct contract with a third person, as in the present instance; and we find in all that the power was given for the conducting of some business for the principal, which imposed on the instrument the construction that the power was to be used for his benefit alone.

It is very difficult to attempt to fix or follow in the administration of justice any general rule of construction, which shall extend to every possible case in relation to any class of instruments of so general use and of such variety. The mode in which a power is to be executed as indicated by the instrument itself is an index to the purpose for which it was given, which must always be the guiding principle in determining its extent. The difference between a power to transact the business of the principal, which undoubtedly operates as a restricting clause in a letter of attorney, however general the other terms may be. and the contract under consideration between the plaintiffs and the defendant, appears to us so obvious, as to place the latter entirely out of the operation of those salutary rules which are recognised as limitation upon the authority of agents acting under a written authority from their principals.

It is urged on behalf of the defendant that, to hold him bound by these en-

dorsements of *McDonald.* would conflict with the rule that, in matters of agency the agent cannot act so as to bind his principal where there is an adverse interest in him, as in the case of an agent employed to sell he cannot himself become the purchaser, and one employed to buy cannot himself be the seller. Independent of the construction which we think the power of attorney carries with it, we do not consider the rule as applicable to the case before us, in which there was, a contract between the defendant and the bank, which was completed on the discount of the notes. The accommodation notes made by *McDonald* in favor of *Hagan*, and endorsed by him as agent, created no obligation between the two parties. Accommodation notes do not bind parties in the form in which they, are made; no action can be maintained on them by virtue of the instruments themselves. They are mere fictions—fabrications of credit, by which the parties hold themselves out by their signatures to be absolutely bound to every person who shall take them for value, in the usual course of business. Vide Chitty on Bills, 6. Bell, Law of Scotland, § 346. There was no contract made in this case until the notes were discounted by the bank, and the authority of *McDonald* to bind the defendant still rests upon the power of attorney; and the question is, whether this mode of raising money, by fictitious credit in this form with a bank, is included in it. That a large portion of the discounts of banks is made upon notes and bills on the faith of the signatures alone, and without reference to their origin or consideration, is a fact which we feel ourselves authorised in assuming. We think that there is nothing in the rule of law relied upon, which prevented *McDonald* from binding *Hagan* to the bank by his endorsement. The case of *Florance* v. *Adams*, cited by counsel, we consider not applicable to the state of facts which this case presents.

The bank is charged with having connived at and participated in the fraud of *McDonald* in discounting the notes; of this we have no evidence. It is said that the bank kept the defendant in ignorance of what was done by *McDonald*. Without remarking on the difficulty of such conduct on the part of a public institution with which the defendant had business, and during a series of years, there is nothing before us from which the fact of ignorance on the part of the defendant of the use of his name by *McDonald* on his own notes can be inferred, when the relations between the parties are fully considered. It is stated in argument that in order to lull the suspicion of *Hagan* more effectually, the following certificate was issued on the 23d July, 1845 :

"Dear Sir.—Upon examination, we find that neither *John*, or *Alexander Hagan* individually, or as a firm, are upon any paper in this bank. Bank of Charleston, S. C.                                   A. MOISE, JR., Ass. Cashr.

" July 23, 1845.

" To ALEXANDER MCDONALD, Esq."

This certificate was given by *Moïse* to *McDonald*. The only note of *McDonald* bearing the names of *John* or *Alexander Hagan*, then running in the bank, was one for $2,600, due the 26–29th July, 1845, which *McDonald* paid in advance, on the 23d, before obtaining the certificate. We find nothing in the reasons assigned by *McDonald* on application for the certificate, which could create distrust in his good faith or solvency. Bearing in mind that, since October, 1841, *McDonald* had been in the habit of borrowing large sums of money upon his own notes, endorsed by him in the name of the defendant under the power of attorney, as late as 1845; and that, in the months of May, June, July of that year drafts were discounted at the bank belonging to *Hagan*, and the

BANK OF
CHARLESTON
*v.*
HAGAN.

proceeds passed to the credit of *McDonald*, and two of them were negotiated on the 24th July, the day after the date of the certificate, we proceed to consider it.

This certificate was to make known to the defendant, what? Whether his name was upon the paper of *McDonald* in the Bank of Charleston. Had he endorsed *McDonald's* paper himself? This is not shown or pretended. How then could his name be upon *McDonald's* paper in that bank, except under the power of attorney lodged there? This circumstance, so far from establishing an artifice on the part of the bank, points to the conclusion that the power had been heretofore used in endorsing *McDonald's* notes to the knowledge of the defendant, and the certificate was to ascertain for what sum, if for any, his name was on the paper at that time. It furnishes a key to the true intent of the power of attorney. If the defendant had suspected *McDonald* to be capable of abusing the trust confided in him, would he not have revoked the power? The certificate relates to the *present time*, not to the past, and its production is certainly evidence that the state of facts which it disaffirms might exist. If the suspicion of the defendant related to what he considered an abuse of his confidence, the certificate, if required at all, would not have been satisfactory, unless it contained evidence that *McDonald had not so used his name in the bank*, of which fact it contained no proof whatever. This circumstance of the certificate, and its terms, indicate an enquiry into the use, and not the abuse, of the power by *McDonald* and the bank.

- On a demand for payment of these notes, the defendant declined making any offer of settlement until he could ascertain the extent of his liabilities from the acts of his uncle. This is testified to by the person who was the agent of the bank, and is uncontradicted. The witness entertained no doubt of being able to make a settlement, until the matter was referred by the defendant to his counsel.

We alluded to the testimony of *Alexander Hagan* in relation to the power of attorney used at the bank. It is not without importance in elucidating the object for which it was given. In his answer to a cross-interrogatory propounded by the plaintiffs, among other things, he states: " I gave *McDonald* a power of attorney in 1841; it was in the form used by the Bank of Charleston for such instruments, and was to enable him to draw a note in my name in the event of his wanting money during my absence. I went to New Orleans immediately afterwards. *Hugh McDonald* had died shortly previous, in June, or July, 1841, and up to his death *Alexander McDonald* had held a *similar power* given by said *Hugh McDonald*. The witness is the brother of the defendant, and the nephew of *McDonald*, and is the person whose name is mentioned in the certificate, which was shown to him and the defendant by *McDonald*, at the same time and on the day on which he procured it. The witness returned to Charleston in 1842, and frequently asked *McDonald* whether he had used the power, and *McDonald* always denied having used it. The witness states that the defendant had no knowledge of *McDonald's* having used his power of attorney; that he, the witness, heard the defendant, from time to time, from its being given up in July, 1846, make enquiries if he had exercised the power *for any purpose*, to which *McDonald* always replied in the negative. The defendant and *McDonald* settled accounts on the 28th July, 1846, and the balance due by him to *McDonald*, $5,079 50, was paid by the check of the witness, who had business transactions with the defendant growing out of a shipment of

slaves to New Orleans, and their sale on commission by the defendant. Mc-Donald absconded three days after the settlement, on the 31st of July. The power was revoked on the 13th of August.

The construction we have given to the power, and the facts connected with the use made of it, concur, *Judgment affirmed.*